BEADLE *v.* ANDERSON.

1. EVIDENCE—WITNESSES—STATUTES—FACTS EQUALLY WITHIN KNOWLEDGE OF DECEASED—ESTATES OF DECEDENTS.

Statements made by deceased to complainant, or by her to deceased, or by him to others in her presence, are excluded by 3 Comp. Laws, § 10212, as amended by Act No. 36, Pub. Acts 1903.

2. DEEDS—MENTAL COMPETENCY—EVIDENCE—ESTATES OF DECEDENTS.

Deeds made in contemplation of death, as a distribution of his property, by the father of complainant, who, although upwards of 75 years of age and in ill health, had in mind his property, the disposition which he intended to make of it, and the persons entitled to his bounty, and who was able to transact other important business in a competent manner, are not shown to be invalid because of mental incompetency.

3. SAME—EXPERT AND OPINION EVIDENCE—WEIGHT.

Testimony of physicians, in reply to hypothetical questions, based on the extreme claims of a party and not supported in all respects by the preponderance of evidence, does not control the question of mental competency.

4. SAME—ESTATES OF DECEDENTS.

The fact that a division of the parent's property is not equal between children regarded with equal affection is not a sufficient ground to disturb the distribution.

Appeal from Huron; Beach, J. Submitted June 15, 1909. (Docket No. 67.) Decided November 5, 1909.

Bill by Dorothy J. Beadle against George D. Anderson and another to set aside certain deeds. From a decree for complainant, defendant George D. Anderson appeals. Reversed, and bill dismissed.

*Paul Woodworth* (*George W. Weadock* and *Miles J. Purcell,* of counsel), for complainant.

*Olin Pengra* (*E. V. Ingersoll* and *De Vere Hall,* of counsel), for appellant.

McALVAY, J. The bill of complaint in this case was filed by complainant for the purpose of setting aside certain deeds of real estate in Huron county made during his lifetime by Darling Anderson, her father, to complainant and to her brother, George D. Anderson, principal defendant, on the ground that said deeds were procured by fraud and undue influence, and that at the time of making such deeds Darling Anderson was mentally incompetent. Defendants George D. Anderson and Janet G. Anderson answered the bill of complaint, denying all the material allegations, and the other defendants, minor children of complainant, by a guardian *ad litem*, answered *pro forma*, leaving complainant to her proofs. A hearing was had, and a decree granted setting aside said deeds on account of the mental incompetency of the grantor, Darling Anderson, at the time they were made, executed, and delivered, and "because said deeds were procured by undue and improper influence exercised over said grantor." From this decree defendant George D. Anderson has appealed.

Before stating the material facts in the case, it will be proper to state that there is no substantive evidence in the case tending to show in any particular that any fraud, undue, or improper influence was at any time exercised or attempted by defendants George D. Anderson and Janet G. Anderson, or any other person, to induce the making of the deeds sought to be set aside, or for any other purpose; nor is there any circumstantial evidence in the case from which a reasonable inference could be drawn that undue or improper influence was exercised or attempted by any of said parties upon Darling Anderson. The question of undue influence will be considered as abandoned by complainant. We find from a reading of the entire record that the material question in the case is one of fact, relative to the mental competency of this grantor at the time these deeds were executed.

Darling Anderson and three brothers, all natives of Scotland, removed from the Province of Quebec to Huron

county, Mich., in 1860, and settled upon farms near each other, and all remained upon the same farms or in the immediate vicinity until the happening of circumstances out of which this litigation arose in 1904. Darling Anderson was a man of integrity and ability, thrifty, and respected in the community where he resided. He was well educated, and kept himself well informed upon current events. He was strong-minded and self-reliant. He was prosperous and accumulated 440 acres of farm lands of the claimed value of about $18,000. His family consisted of his wife and two children. They lived together happily, and he always treated his children with equal regard. They both married, and he built for each a suitable house upon his land, not far from his home, where they continued to live until his death. Complainant married first, about the year 1893, and with the exception of one year has lived in the house given to her, and her husband, William J. Beadle, has been employed by her father. The son has always been employed on these farms. The three brothers of Darling Anderson have always been men of good reputation, and prominent citizens in that neighborhood. All these brothers have been farmers, in comfortable circumstances, who have lived on the friendliest terms with each other without any estrangement or differences between them, occasionally visiting each other, and no differences have arisen between them and the wives and children of any of them. George Anderson was a notary public, quite experienced in drawing deeds and papers for people in that vicinity. He had been township treasurer for 20 years, and also had held the offices of supervisor and justice of the peace. Darling Anderson had always been a vigorous, healthy man during his whole life up to the age of 74 years. The record would indicate that he had never been seriously sick. Late in 1903 or early in 1904 he began to show signs of old age, and became at times quite sick. He had fainting spells, and in March, 1904, after one of these fainting spells, Dr. Johnson, a practicing physician of long experience, who had known

him many years, was called to attend him. This was the first visit of a physician to him. The doctor made two more visits within the following few days. On May 25th following, Dr. McColl, a practicing physician of 13 years' experience, was called. Before that time he had never seen the patient. He visited him afterwards, on May 27th and 30th, and on June 6th. He was next called and visited him on July 26th. Darling Anderson died August 15, 1904. These physicians are the only ones who saw him during his sickness. They were both called as witnesses in the case, and their testimony will be considered later.

On the evening of July 12, 1904, the son, George D. Anderson, was sent by his mother, at the request of his father, Darling Anderson, to request the three brothers to come to his house on the next day. The son did not know, and did not tell either of his uncles, what was wanted. On this same day complainant and her husband, Mr. Beadle, went on an excursion to Bay City, and returned the same night. The brothers came the next morning, as requested, at about 8 o'clock. They found him up and dressed, and were told by him that he wanted them because he wished to make a settlement of his property. He asked his brother George if he had brought any deeds with him, and was informed that he had, because he thought that this was what he wanted him for. This is the date on which the deeds sought to be set aside in this suit were made and executed. Darling Anderson told his brothers the manner in which he wished to divide his property. Janet Anderson, his wife, was present. The first deed drawn was a deed of 200 acres of land to his son, George D. Anderson. The father dictated the description for this deed from memory, and directed the deed to be so drawn that he and his wife, Janet Anderson, should have a life estate in the land conveyed. The second deed was to his daughter, Dorothy Beadle. It appears that the father wanted a deed of 40 acres to be made to the children of Dorothy so it could

not be squandered.   The suggestion of George An-derson that to give her 80 acres during her lifetime and to her children after her death would accomplish the purpose, and make it impossible for the children, after arriving of age, to turn the parent out, was accepted by Darling Anderson, and a deed of 80 acres was so drawn.   The third deed was to the son, George D.   It was of 160 acres of land in Caseville township, directed to be deeded on the same conditions as in the first deed. Another deed was drawn by his direction on this date to John Howath, of 80 acres of land which belonged to him, but the title to which was held by Darling Anderson.   He called attention to this matter, and requested his wife to get the deed for him.   While these deeds were being pre-pared, complainant came into the room, said good morning, and asked her father how he felt.   He answered her greeting, and said he was feeling all right.   She remained a short time in the room.   The son, George D. Anderson, was at work in the field, and was in the house only at dinner time.   The deeds were not completed at noon, and they all remained to dinner that day.   Darling Anderson sat at the table and ate his dinner with them.   As each of the deeds was completed the grantor's signature was writ-ten by George Anderson, who did so at the request of Darling Anderson, who said his hand was unsteady.   His wife, Janet Anderson, also signed these deeds, and they were witnessed and acknowledged.   After these three deeds were drawn and signed, they were delivered to George Anderson, with instructions by Darling Anderson relative to the recording and delivery of the same to the parties to whom they belonged.   After his brother's death he had these deeds recorded at once, and delivered them as he was instructed to do.

No witness in this case disputes any of the facts which have been stated so far in this opinion.   It is claimed on the part of the complainant that the evidence of the lay and expert witnesses as to the mental and physical condition of Darling Anderson shows that at the time these deeds

were executed he was mentally incompetent, and that such evidence clearly outweighs and overcomes all of the evidence of defendants to the contrary. The record of 350 pages contains the testimony of 40 witnesses. To digest and discuss this mass of testimony is not necessary. All of the evidence in the case is before the court, and has been read and considered carefully. The serious objection to the admission of testimony, and the only one discussed in the briefs, relates to that given by complainant. Objection was made on the part of defendants that, as to matters equally within the knowlege of deceased, her testimony was incompetent by reason of the statute, which provides:

"When a suit or proceeding is prosecuted or defended by the heirs, assigns, devisees, legatees, or personal representatives of a deceased person, the opposite party, if examined as a witness in his own behalf, shall not be admitted to testify at all to matters which, if true, must have been equally within the knowledge of such deceased person." Section 10212, 3 Comp. Laws, as amended by Act No. 30, Pub. Acts 1903.

The objection was well taken. This court has already construed this statute as applying to similar cases. *Lloyd v. Hollenback*, 98 Mich. 203 (57 N. W. 110); *Bailey v. Holden*, 113 Mich. 402 (71 N. W. 841); *Great Camp K. O. T. M. v. Savage*, 135 Mich. 459 (98 N. W. 26). All of her testimony prohibited by the statute was incompetent. This court will therefore exclude from consideration all such testimony, which includes all statements, made by her father to her or to others in her presence, all statements made by her to her father or in his presence, and all other matters which, if true, must have been equally within his knowledge. If the testimony of those who were present at the time the deeds in dispute were executed can be relied on, the only conclusion will be that Darling Anderson was mentally competent at the time. Neither the character, reputation, or veracity of any one of these witnesses is attacked. They were not interested witnesses. There is nothing in their testimony to indi-

cate bias or prejudice.   That the three brothers were sent for by Darling Anderson is not in dispute, nor that the deeds were made and executed as claimed.   Some intimation is made that the cross-examination, particularly of the brother, George Anderson, discredits his testimony. Our examination does not disclose anything in his testimony to warrant such a conclusion.   The peculiar characteristics of their nationality, particularly positiveness, terseness of expression, and seriousness, are strong in all of these brothers.   That they were extremely loyal to each other is also apparent; but that their testimony was in any respect deflected from the truth cannot be inferred from this record.   From this evidence we find that on the day in question Darling Anderson was physically strong enough to be up and about all day.   There is no indication that he was exhausted by the effort to arrange his affairs to his satisfaction. He sat at the table, and took his dinner with the family and his brothers.   The mental condition of Darling Anderson at this time is indicated by what he said and did, and what these brothers who had known him all their lives observed.   That he had in mind his property, and what disposition he intended to make of it, is apparent. He told his brothers why he had sent for them, and asked George if he had brought blank deeds along.   After hearing that the blanks were satisfactory, he stated the disposition he would make of his property.   There were several descriptions of real estate which he owned, and he gave these correctly from memory, without assistance or suggestion.   The details of making the deeds have been sufficiently described.   He also had in mind those entitled to his bounty.   While the deeds were being drawn he was examining various papers and giving directions as to their value, and the probability of collection.   He went into minute details, which indicates that matters of comparative unimportance were receiving his attention.   He also remembered that certain real estate in his name belonged to a friend, and caused a deed of it to be made out

and executed. No act or statement of his made on that date indicates mental disability.

The principal witnesses on the part of complainant, other than medical experts, to show the weak physical and mental condition of Darling Anderson when the deeds were made, are complainant and her husband. That both are intensely interested is evident from their testimony and their relations to the case. From their testimony it would appear that from early in 1904 until the time of his death Darling Anderson was a physical and mental wreck, and totally incompetent to dispose of his property. . The force of their testimony is considerably broken by statements made by both of them on July 12th, the day before these deeds were executed, to friends at Bay City, that the father was better and would get around again. It also appears that the disposition which he had made of his property became known to complainant and her husband, and that they were dissatisfied and unsuccessfully importuned him to change it. It is undisputed that Mr. Anderson during that year was subject to fainting spells, becoming at times unconscious; that he would be taken suddenly and would fall down wherever he happened to be; that after such spells he would be for a time confined to his bed, and during fever would become delirious, but it is also clear from the record that these conditions did not continue during all of this period, but that, when Mr. Anderson was able to be up and around, his mind was clear, and that the delusions testified to were present only when he was confined to his bed. As already stated, two physicians attended him, Dr. Johnson three times in March, and Dr. McColl three times in May, and once in July. The former had known him many years. The latter had never seen him before being called to attend him. It appears from Dr. Johnson's testimony that he was first called to attend him after one of his fainting spells, when he had fallen down. He diagnosed the case as valvular heart trouble. He prescribed for him, and advised, on account of the con-

dition of the heart, to keep him quiet and watch him when he was around because of his liability to fall; that the conditions responded to treatment; and that the patient was improved and growing better when he ceased these visits. He found no senile debility, and the mind of the patient was as clear as usual. The doctor says that the brain was affected by the poison which was not thrown off by certain organs of the body; that this resulted from the weakness of the heart. He did not find any trace of Bright's disease, although he made an analysis for it. He found the lungs somewhat congested, which he also attributed to the condition of the heart, as he would Bright's disease, if it were present. His opinion was that between these recurrent attacks the patient would be competent to attend to any business. About 60 days after the last visit of Dr. Johnson, Dr. McColl visited Mr. Anderson three times, on May 25th, 27th, and 30th, and again once on June 6th, at which time he found the patient improved. He did not know his condition between the dates of the last two calls. He also stated that he would not be able to state whether on July 13th this patient would be able to appreciate what he was doing. His opinion was that at no time was the patient competent to transact business. These physicians do not differ materially in their diagnosis of the case, nor as to the effect of the disease upon the patient, except in degree, and the testimony of Dr. McColl can be reconciled with that of Dr. Johnson and the facts which are claimed to have occurred when the deeds were executed.

The testimony of the expert witnesses, to which complainant gives great weight, is all founded upon hypothetical questions based upon the extreme claims of the complainant as to Darling Anderson's mental and physical condition. Some of these conditions were not established by a preponderance of the evidence. These conditions were not any of them continuous for the six or seven months prior to his death. As already stated, they were recurrent, as the periods which intervened between the

attendance of the physicians most forcibly imply. The bad spells were of short duration. The serious physical condition claimed, relative to the inability of the patient to retain secretions or excreta during the most of the time after his first illness, appears from the weight of the evidence to have occurred during but two or three weeks before his death. Our conclusion is that the evidence shows Darling Anderson at the time was mentally competent to execute these deeds and did so having in mind his property and those who were entitled to his bounty, and made such disposition of it as he desired and as is expressed in the deeds in dispute. The defendant Janet Anderson was not called as a witness. The consideration given by these children to the feelings of their mother is commendable. It is the exercise of a fine sense of the proprieties not always recognized.

As has been often stated, courts must recognize the intelligent and intended disposition the owner makes of his own property, whether or not it accords with what they would do under like circumstances. The fact that a division is not equal between children regarded apparently with equal affection is no sufficient reason to disturb a disposition of property so made, as has been many times declared. In the case at bar it appears sufficiently clear that Darling Anderson thought, on account of the ease with which his son-in-law accumulated debts, that the disposition made by him was sufficient for his daughter's comfort, and the best to be made in order to insure her a home and the certain means of a reasonable support during her lifetime.

The decree of the circuit court is reversed and set aside, and a decree will be entered in this court denying the relief prayed and dismissing the bill of complaint, with costs of both courts to defendants.

BLAIR, C. J., and GRANT, MONTGOMERY, and BROOKE, JJ., concurred.