GRIFFITH v. FULLER.

CANCELLATION OF INSTRUMENTS—INCOMPETENCY—DEEDS—CAPACITY —ESTATES OF DECEDENTS.

Conflicting evidence considered, and *held*, to be insufficient to support a decree setting aside a deed of decedent on the ground of mental incapacity.

Appeal from Kent; Brown, J. Submitted April 16, 1914. (Docket No. 51.) Decided July 24, 1914.

Bill by Ottie Griffith and others against Eunice Fuller for an accounting and other relief. From a decree for complainants, defendant appeals. Reversed.

*William J. Landman*, for complainants.
*Smedley, Linsey & Lillie*, for defendant.

The complainants in this case are children and grandchildren of Nichols Cox, and are all of his legal heirs. They filed their bill of complaint for the purpose of setting aside a deed made by said Nichols Cox in his lifetime to the defendant. The bill further demands an accounting from said defendant for all

moneys and personal property now in her hands formerly belonging to said Nichols Cox. The grounds upon which said relief is sought are that at the time of the execution of said instrument said Cox was mentally incompetent, and that he was also induced to execute the instrument in question through undue influence exercised by said defendant.

In February, 1911, Nichols Cox, then a man 73 years of age, lost his wife. His children, five or six in number, were grown up, and were no longer members of his household. While the relations between himself and his children seem to have been in the main friendly, he seems to have been unable to live agreeably with any of them after the death of his wife. Prior to the death of his wife he had been for several years afflicted with prostatic and kidney trouble which later developed into Bright's disease. From about the year 1905 up to the time of his death he suffered from the effects of this disease, the attacks recurring with varying frequency as well as intensity. The effect of Bright's disease as described in the medical testimony is at times to cause in the afflicted person a toxic condition resulting from uræmic poisoning. After a violent attack and the kidneys are brought to function properly the toxic effect usually wears off, and the patient will again become practically normal, so far as his mentality is concerned. Apparently because of evidences of unsoundness of mind and erratic action on the part of Nichols Cox while suffering from these recurring attacks during the year 1911, his children became apprehensive that he would dissipate his estate, and they caused proceedings to be instituted in the probate court for the county of Newaygo for the appointment of a guardian. Under date of November 28, 1911, the probate court seems to have entered an order appointing one Robert S. Hall as such guardian. Hall, however, never entered upon the discharge of his duties. Nichols Cox was much disturbed

over the application, and on December 18, 1911, he with his children and their respective attorneys appeared in said probate court in Newaygo county, and he there orally stated that he would not knowingly dissipate his property, and that his decease all his property then remaining should go to his children; that he would not disinherit any of said children; and that it had never been his intent to so do. This statement was reduced to writing entitled in the cause, and was signed by the attorneys for the several parties, and was filed in the court by the judge of probate who was present when it was made. Thereupon the proceedings for the appointment of a guardian were dismissed. At and prior to this time it appears that Cox had been boarding at the "Bridge Street House" while in the city of Grand Rapids. Very shortly after the probate proceedings, in discussing his affairs with one Markham, he said that he purposed resuming housekeeping if he could secure the services of a competent housekeeper. About the 1st of January, 1912, Markham introduced him to the defendant in this case, a woman some 67 years of age. After several interviews Cox agreed with the defendant that if she would become his housekeeper and take care of him during his remaining years he would buy a home for their joint use, which at his death should become hers, and likewise that he would supply her with money sufficient to meet her personal needs. On January 18th Cox and the defendant commenced living in apartments in the Markham House, occupying three rooms upstairs, and immediately sought a suitable house in which to reside. After examining many pieces of property, about April 1st he purchased the house and lot in question in this proceeding and immediately moved into it with defendant. The record does not disclose how much he paid for the property, but the testimony indicates its value to have been between

$700 and $900. Later in the year he bought the house adjoining, not quite so valuable, for $600. He continued to be up and about during the summer and fall of 1912, attending to his ordinary business transactions. During this time he purchased the house and lot adjoining the one occupied by him and defendant, and borrowed $200 at his bank, giving his note therefor. The disease from which he was suffering was, however, a progressive one, developing in the latter weeks of his life into arterio sclerosis. From midsummer on a physician attended him with considerable regularity, but he was not confined to his bed. In November he became somewhat worse, although at the election on November 5th he was able to go to the polls and vote. On the 6th of November he requested Mr. Markham to call a lawyer to prepare the deed of the house and lot to defendant. The lawyer, Mr. McBride, was dead at the time this cause was heard in the court below. The notary public, however, Mr. John P. Seven, who witnessed the deed and took the acknowledgment of Cox, was sworn as a witness. Markham likewise was present when the deed was executed, acknowledged, and delivered. Either before or shortly after the execution of this deed Cox indorsed a certificate of deposit in the sum of $100, and on the 15th day of November this certificate was cashed by the defendant. On November 17th Cox died; several of his children being present at his bedside during his last moments, although they had not visited him at any time while he resided with the defendant on Frederick street. Administration was at once taken out upon his estate and the inventory filed. The distribution thereof shows that he left real and personal property to the amount of $19,000, exclusive of the value of the premises conveyed by him to defendant. The following conditions were inserted in said deed at the request of Cox, as testified to by Markham.

"Saving and reserving to said party of the first part a home and the continued housekeeping and care of the said party of the second part during his natural life, she hereby agreeing to continue as in the recent past as his housekeeper and nurse.

"Also, in further consideration I hereby sell, assign, set over, and deliver to said party of the second part all personal property belonging to me and now in my possession on said premises or used therewith, subject to the common use of both said parties during the natural life of said party of the first part."

A decree having been rendered setting aside said instrument upon the grounds of mental incompetency and undue influence and requiring defendant to account for the personal property received by her under the terms of said instrument, she has appealed.

BROOKE, J. (*after stating the facts*). We are convinced that the decree of the court below should not be permitted to stand. A careful reading of the entire record discloses the fact that the witnesses for the complainants—and there were very many of them —with scarcely an exception, gave evidence tending to show that, while Nichols Cox, when suffering acutely from uræmic poisoning, acted irrationally, forgetfully, and in a manner indicating a lack of mental balance, yet, after these attacks passed off, he conversed rationally on every subject, and appeared to be entirely competent mentally. He continued up to a very few days of his death to transact his ordinary business affairs. There can be no doubt that between the attacks or spells described by the various witnesses the man was lucid and competent. The evidence of the physician who attended him during the last months of his life is extremely persuasive of this fact, and the evidence of those present at the time of the execution of the deed, uncontradicted and unimpeached, is to the effect that at the time the instrument was executed and delivered he was in full possession of all

his faculties. The question at issue in the case is not whether at other times and places Cox was or was not rational, but whether on the day and at the time of the transaction he possessed sufficient mental vigor to understand and appreciate the effect of the business in hand. The making of the conveyance in question was but the carrying into effect of an agreement made by him with the defendant nearly a year earlier. It was simply an act of justice upon his part in reasonably compensating the defendant for her care of him during a period of almost a year. Had he failed to carry out his contract with her in this regard, his estate would have been subject to a claim in her behalf for her services to him. While, as was said in *Lane* v. *Lane,* 160 Mich. 492 (125 N. W. 365), previous decisions are of little assistance in determining the question of mental competency, each case resting upon its own facts, attention is directed to the following cases: *Ramsdell* v. *Ramsdell,* 128 Mich. 110 (87 N. W. 81) ; *Beadle* v. *Anderson,* 158 Mich. 483 (123 N. W. 8) ; *Terry* v. *Terry,* 170 Mich. 330 (136 N. W. 448).

The decree of the court below is reversed, and a decree will be entered in this court dismissing the bill of complaint, with costs of both courts to defendant.

McALVAY, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.