GRAND RAPIDS TRUST CO. v. ATHERTON.

1. Deeds—Mental Competency.

Whether or not a grantor was competent to make a conveyance should be determined by his mental vigor at the time of the transaction.

2. Insane Persons—Setting Aside Conveyance—Restoration of Sanity—Evidence.

In guardian's suit to set aside a deed, executed by ward shortly before guardian's appointment, because of claimed mental incompetency of ward, order, adjudicating her restoration to sanity and made after hearing in instant case, which was not in record *held,* subject to consideration only as an admission that ward's condition was not serious.

3. Same—Evidence—Natural Justice.

In suit by guardian to have deed to lake cottage from ward to her stepson set aside on ground of ward's mental incompetency to make it, evidence *held,* insufficient to warrant decree for guardian in view of comparative size of gift and ward's estate, affection for grantee and other considerations.

Appeal from Ottawa; Miles (Fred T.), J.   Submitted April 21, 1936.   (Docket No. 149, Calendar No. 38,763.)   Decided June 11, 1936.

Bill by Grand Rapids Trust Company, guardian of Maude D. Atherton, against Ernest A. Atherton to set aside a deed and for other relief.   Decree for plaintiff.   Defendant appeals.   Reversed.

*Leo C. Lillie* and *Howard W. Fant,* for plaintiff.

*Charles H. McBride,* for defendant.

BUTZEL, J.   Maude D. Atherton had been married for approximately 20 years to Dr. Alfred W. Atherton, a dentist of Grand Rapids, whose son by a previous marriage, Ernest A. Atherton, is defendant herein.   Mrs. Atherton regarded Ernest as her own son and he in turn showed her great filial devotion and affection.   She owned considerable real estate, consisting principally of vacant lots, but also of some income-producing property.   She had owned a cottage at Big Pine Lake near Grand Rapids and on or about November 1, 1933, sold it on land contract to Ernest for $1,200, payable at the rate of $10 per month with interest at five per cent. per annum.   The record indicates that Ernest is honest, industrious and considerate and that for over 17 years he had held continuously a good position.

At the beginning of 1935, Mrs. Atherton was about 73 years of age.   Her health had been failing.   During the previous year a cousin or close friend had dropped dead in her presence on a street in Grand Rapids.   Shortly thereafter, she suffered a severe shock but no serious physical injury in an automobile accident.   She and the doctor, who was seven or eight years her senior, quarrelled considerably,

particularly over money matters, he making frequent financial demands on her. She was nervous and of varying moods, but she was wholly devoted to Ernest and a number of times stated that she wanted him to have the cottage outright, if anything ever happened to her. On February 3, 1935, he received a telephone call from his father who stated that Mrs. Atherton wanted to see him on business matters. A witness, who overheard the telephone conversation, testified that Ernest's father stated that Mrs. Atherton wanted to turn the Big Pine Island cottage over to Ernest. He immediately left his home in Evanston, Illinois, for Ottawa Beach where the old folks were living. He received an affectionate greeting from his stepmother. Shortly after his arrival, she sent for a notary who drafted a deed transferring to Ernest the absolute title in the Big Pine Island cottage which he had been purchasing on the land contract and on which he still owed approximately $1,100. After she gave Ernest the deed she expressed her happiness over what she had done and asked two of her friends to lunch with her to celebrate the event. There is no claim that Ernest ever asked for the deed or exercised any undue influence in obtaining it. Mrs. Atherton paid the scrivener for his services. The deed was dated February 1st, but was drawn on February 4th or 5th, the latter date being probably correct. The scrivener could not explain why the deed was antedated.

On February 6th, Ernest filed a petition under oath in the probate court of Ottawa county asking that Mrs. Atherton be adjudicated mentally incompetent. On the following day he wrote the probate judge that it was necessary that a guardian be appointed "as mother seems to be losing her mind so fast." A few days later, however, he wrote to the

judge of probate that he wanted to withdraw the petition. Ernest testified that shortly after he arrived at Ottawa Beach and after the deed was executed, his father told him that his mother was losing her mind and that it would be necessary to have a guardian appointed for her and have her placed in an institution; that in order to prevent her being institutionalized, Ernest wanted to be appointed guardian; and that his talk with his father impressed him with the necessity of haste; that a few days later, however, on finding that he had been mistaken, he asked that the petition for guardianship be withdrawn. His mother gave him a power of attorney to look after her affairs and he went with her to the safety deposit box from which moneys and securities were removed to another box for safekeeping. There is no question raised but that he accounted for every dollar that he thus received. Miss Vande Water, the judge of probate, testified that when Ernest came to see her he stated that his mother was being irritated in the home; that he wanted to prevent her being sent to an institution; that subsequently he wrote the judge a letter from Evanston, Illinois, dated February 10, 1935, in which he stated:

"I feel that I owe you an explanation of what changed my mind on the application for a guardian for mother.

"I was called over there last Monday night as mother wanted to see me. I saw mother a very short time as I was in a hurry to get back to Chicago. I tended to the things that were on her mind and she seemed rational that evening, but in the morning she was not so good. As my father had called the doctor to show him she should be put in an asylum I felt I should act at once.

"The doctor found her mind better than father's and said he could hardly sign paper for guardian-

ship on the grounds stated in the petition as the most he could see was that she was run down over worry, under-nourished, and lack of rest.

"Mother sent for me again Friday and I went over and she said she was glad I applied for guardian but did not just like the words 'diseased mentally' and Doctor Thomas asked me what the judge said and I told him you suggested I be given power of attorney which pleased mother better. I had a notary and lawyer draw it up and she signed with two witnesses and she said it gave her relief to know I was going to attend to her business for her. Mr. McBride of Holland was the attorney.

"Father was feeding her lots of lemonade and even waking her up in the night when she was resting to give her lemonade or coffee and to talk about business."

Within a few days after executing the deed Mrs. Atherton also made a will, leaving all her property to Ernest after the death of her husband who was to have the use during his life. Neither the will nor the power of attorney are involved in the present proceeding. On or about March 12, 1935, Dr. Atherton filed a petition in the probate court to have a guardian appointed for his wife. The petition was granted.

The Grand Rapids Trust Company, which was appointed guardian, filed a bill to have the deed to Ernest set aside.

Two doctors who were appointed to examine Mrs. Atherton by the probate court in the proceedings begun by Dr. Atherton testified that they examined her over a month after the deed had been executed. They reasoned backwards and stated that her condition at the time of their examination showed that she was not competent to give a deed on February 4 or 5, 1935. They are supported by corroborating testimony of lay witnesses. On the other hand, the

family doctor who attended her the day after the deed was given and thereafter, and many other witnesses all gave testimony showing that she knew exactly what she was doing and that she was fully competent on the day she executed the deed. We have held on many occasions that whether a grantor was competent to make a conveyance should be determined by his mental vigor at the time of the transaction. *Griffith* v. *Fuller,* 181 Mich. 553. Mrs. Atherton herself was sworn as a witness and stated that she did not remember that she gave the deed and that her mind was a blank as to what occurred. Attorney for appellee in his brief calls attention to an order that was made after the hearing in the instant case. It adjudicated Mrs. Atherton's restoration to sanity. The order obviously is not in the record and may not be considered except as an admission that Mrs. Atherton's condition was not serious. · Her testimony indicated that her mind seemed to be very alert as to other transactions, notwithstanding her claim that she did not recall giving the deed. We are not at all impressed by her testimony which indicates that she is shrewd and desirous of winning the lawsuit. About the same time that she gave the deed, she issued two small checks in payment of bills. She was able to go to the bank with Ernest to withdraw her securities from the safety deposit vault. The testimony of her family doctor, who saw her during the early part of February, 1935, is far more impressive than that of plaintiff's doctors who, notwithstanding their knowledge of psychiatry, did not see her until over a month after the deed was given and depended largely on information from others as to her condition at the time of the conveyance.

While it is not controlling, we find nothing contrary to natural justice in her turning over $1,100

worth of property to Ernest, who was so dear to her, from an estate of considerable size. The trial judge based his decision largely on the immediate proximity of the time of filing of the petition by defendant to have his mother adjudicated insane to her giving of the deed, but this is explained by the difficulties she was having with her husband and the fear on the part of Ernest of having his mother sent to an institution as shown by Ernest's testimony and that of the probate judge. The bill should have been dismissed. A decree will be entered to that effect and defendant will recover costs.

NORTH, C. J., and FEAD, WIEST, BUSHNELL, EDWARD M. SHARPE, and TOY, JJ., concurred. POTTER, J., took no part in this decision.