## REAGAN *v.* MURRAY.

1. COMPETENCY—DEEDS—CAPACITY OF GRANTOR.

    Evidence tending to prove that decedent executed deeds of all his real property to his son, excluding his daughter from any share in his estate, at a time when he had become enfeebled by illness, that he had failed rapidly after the death of his wife and prior to the making of the deeds, that his memory was impaired but he was capable of transacting business understandingly and was active mentally, and well preserved both mentally and physically at the age of 85, *held*, insufficient to invalidate the transfers.[1]

2. DEEDS—BURDEN OF PROOF—EVIDENCE—INCOMPETENCY.

    The complainant, seeking to set aside voluntary deeds of a decedent, has the burden of proving a charge of incompetency by a preponderating evidence, so that evidence which does not prevail over defendant's testimony, or which is so evenly balanced as to leave the issue in doubt, will not sustain the claim of incapacity.

3. GIFTS—TESTAMENTARY DEEDS—PARENT AND CHILD.

    Mere inequality or unfairness between a grantor's children or heirs will not invalidate deeds of his property executed in contemplation of death, if he acted understandingly.

4. DEEDS.

    *Held*, that the weight of the evidence sustained the capacity of defendant's grantor to make a disposition of his estate by deed.

Appeal from Mackinac; Shepherd, J. Submitted April 14, 1913. (Docket No. 59.) Decided July 9, 1913.

---

[1] As to the validity of a deed by an incompetent person, see note in 19 L. R. A. 489. And on the question whether a deed of real property executed by an incompetent not judicially declared such may be avoided in action at law, see note in 19 L. R. A. (N. S.) 461.

Bill by Mary Reagan against Thomas B. Murray for the cancellation of certain deeds. From a decree for complainant, defendant appeals. Reversed.

*James J. Brown (Halstead & Halstead, of counsel),* for complainant.

*Henry Hoffman,* for defendant.

STEERE, C. J. The bill of complaint in this suit is filed for the purpose of setting aside, on the ground of fraud and incompetency, two deeds, dated August 17, 1910, executed by Michael Murray shortly before his death, conveying all his real estate to defendant.

Complainant and defendant are brother and sister, and only heirs at law of said Michael Murray, who died at St. Ignace, Mich., on August 23, 1910, at the age of 85 years. He had resided in St. Ignace for over half a century. At the time of his death he was a widower, his wife having died less than a year previous. He owned about 10 acres of land in the city, upon which were five comparatively small and inexpensive dwelling houses; also about 200 acres of land near by, and was possessed of personal property, estimated at from $400 to $500. His last illness was only of about eight days' duration.

Complainant, at the time of the hearing in this case, had been married 34 years, having a husband and six living sons, the eldest of whom was 32 years and the youngest 15 years of age. Her husband, a man of respectability and responsibility, formerly a blacksmith by trade, had been for many years a justice of the peace of the city of St. Ignace, and was then also acting as janitor of the First National Bank of said city.

Defendant was a bachelor 50 years of age, by occupation a woodsman, and was employed at the time of his father's death and for years prior thereto as a

foreman in the lumber camps of a cousin. He had at times been dissipated, and caused his father much trouble and anxiety, but in recent years appears to have changed his habits. He is crippled in his hands, and, on account of such condition, partially incapacitated for manual labor. He might find it difficult to procure employment with strangers, but had been able, in the employ of his cousin, to earn regular wages as a scaler and foreman.

During his long residence in St. Ignace deceased was known as an unusually strong and vigorous man, mentally and physically, and something of a leading character. He had two brothers, David and Patrick, with whom he was associated in various business activities, including owning and dealing in a tract of land. He had charge of and managed this business for the three. He had held different public offices for many years, having been supervisor of his ward, member of the board of aldermen, and for some 15 years prior to his death a member and secretary of the board of poor commissioners of the county. He was a temperate man, religiously inclined, of strict integrity, and of general good health according to his age. Up to the time of his last sickness he attended to the affairs of his office as secretary of the board of poor commissioners, looked after his own business matters, continued the habits of his life in going daily to the post office, a distance of nearly a mile from his home, and regularly to church, which was about the same distance. He walked to church on August 14, 1910, the day preceding the one on which he was taken with his last illness. The consensus of opinion on the part of all the witnesses, including those of complainant, is that he was a man remarkably well preserved for his age, and, though becoming more feeble and less vigorous as age came upon him, his mind was active and he was capable of transacting his

business affairs understandingly, was in possession of his faculties, and retained his characteristics of mind up to the time of his last sickness, except that complainant and her husband claim and testify that after the death of his wife he failed rapidly and his memory was perceptibly impaired.

Such testimony, even though undisputed, is not evidence that he was mentally unsound. *Lynch* v. *Doran*, 95 Mich. 395 (54 N. W. 882); *Davis* v. *Phillips*, 85 Mich. 198 (48 N. W. 513). Complainant's husband testified that up to the 1st day of August, 1910, he was mentally capable to transact business and convey his real estate understandingly if he so desired. Counsel for complainant say, in their brief:

"On the issue of mental competency we are asked to believe that up to the time of his death Michael Murray was a man of more than ordinary ability. We are ready to admit—have never denied—that normally, and when he was in active business life, he was a man of fair, average ability, and more or less familiar with the class of business that would likely interest him, including the transfers of real estate; but we do insist that such was not his condition after he was taken sick, or even before that time, but he was failing, mentally and physically, all of the time."

That the burden of years was bearing on him is undoubtedly true, but the testimony is so overwhelming, that up to the time of his last sickness he was fully competent to transact business and make conveyances of real estate understandingly, that we shall spend no further time on that question. That he was a man of independent thought and not easily influenced is strongly established, and the only serious issue in the case is whether or not, after his sickness and at the time he executed the instruments in question, he had so changed and become so enfeebled, both

physically and mentally, that the execution of the deeds in question was not his own intelligent act in disposing of his property according to his actual wishes.

Deceased and his wife had, prior to her death, lived alone in their own home for many years except as defendant went and came, making his home with them when not away at his employment in the woods.

Up to the time of deceased's death the relations of all the various members of the family were apparently pleasant and harmonious. Complainant had lived for many years at her own home with her husband and children, in the neighborhood of half a mile distant from that of her parents, with whom she and her family frequently visited back and forth, exchanging the mutual help, hospitality, and attentive manifestation of affection, good will, and interest, appropriate and common to such close relations. Deceased had given complainant the lot on which their home was built by her husband shortly after her marriage, and was kind and helpful to the family in many ways, prompted by his interest in their welfare rather than their necessities, for the husband was independent and cared for his family and business affairs. Deceased's wife had been in feeble health for some time before her death, and complainant had been much at her father's house on that account, looking after and helping care for her mother. After the mother's death, the father being left alone and desirous of remaining at the home, where he had lived for many years, complainant with her husband and family moved to her father's home to look after and care for him, as she and her husband claim at the solicitation of defendant and the father; to which defendant does not fully assent, claiming it was their own suggestion, and that the father, though kindly disposed to them, was at times annoyed by, and objected to, the number and noise of the children.

Defendant became less of an anxiety and more of a comfort to his parents as he grew older. He had been quite regularly in the employ of his cousin for about 12 years before his father's death. When not away at work he lived with his parents, and frequently went home from his work in the woods to spend the Sabbath with them. He helped them in a financial way at times, employing domestic help for his mother after she grew feeble, and procured necessaries or conveniences for the household. During a period of about six years he paid for the care of an afflicted sister, who subsequently died in the State hospital, the cost amounting at times to $26 per month. He had come from the camps and visited his father the day before he was stricken with his last illness. It is clearly shown that deceased was on good terms with, and had paternal affection for, both of his surviving children.

On Monday, August 15, 1910, Michael Murray became seriously ill with an attack described by complainant as "summer complaint" and "general weakness." A physician was summoned who, after examination, expressed the opinion that the patient would not recover. He was a Catholic, so a priest was then called to minister to his spiritual needs and defendant was notified, coming at once by special conveyance and remaining until after the death and funeral. On August 17th the deeds in controversy were executed by deceased in the presence of his brother, Patrick Murray, and a relative named Charles Murray, who had prepared the deeds, was a notary public and took the acknowledgment. On August 18th the parish priest administered the last sacrament to deceased, and on August 23d he died.

The value of the real estate described in the deeds in question was not great. Patrick Murray, the brother, who also owned similar property, estimated

that in the city as worth $2,000, and stated he had unsuccessfully offered similar land in the country at $5 per acre. Reagan, complainant's husband, estimated the 200 acres outside of town at $20 per acre, and the city property at about $3,000.

There is no direct evidence of fraud or undue influence in procuring the conveyances. The testimony of all witnesses and participants is to the contrary, and to the effect that what was done was at the request and on the initiative of deceased, without prompting or interference from any one. The testimony is also clear that, when normal, deceased was a man of independent and positive views, not easily deceived or influenced. The claim of fraud can only be urged by inference, based on and arising from the claim of mental incompetency, which is the actual issue before us.

The object of this bill being to set aside these deeds on the ground of incompetency on the part of the grantor, primarily the burden of proving the charge by a preponderance of evidence rests upon complainant, and if the testimony does not prevail in her favor, or is so evenly balanced as to leave the question in doubt, her suit must fail. *Brown* v. *Brown,* 39 Mich. 792; *Gibbons* v. *Dunn,* 46 Mich. 146 (9 N. W. 140) ; *Corby* v. *Moran,* 119 Mich. 272 (77 N. W. 930) ; *Hayman* v. *Wakeham,* 133 Mich. 363 (94 N. W. 1062) ; *Behrns* v. *Qualman,* 147 Mich. 635 (111 N. W. 198).

It is urged in behalf of complainant that when it is shown the deeds were made by a very old man, sick and feeble, on his deathbed, and without consideration, the transaction is to be regarded with suspicion, and the burden shifts to defendant to establish its fairness and show that the grantor understood the effect and character of the instruments he signed—citing 13 Cyc. p. 737; *Duncombe* v. *Richards,* 46 Mich. 166 (9 N. W. 149) ; *Crawford* v. *Hoeft,* 58 Mich. 1

(23 N. W. 27, 24 N. W. 645, 25 N. W. 567, 26 N. W. 870) ; *Gates* v. *Cornett,* 72 Mich. 420 (40 N. W. 740) ; *Brennan* v. *Zehner,* 97 Mich. 98 (56 N. W. 231).

The only testimony directly tending to show that deceased was not competent to understand what he was doing and did not advisedly execute the conveyances is that of complainant and her husband. They testify that from the beginning of his illness he realized but little of what was passing; was at times delirious and at others in an apparent stupor; that he could not raise his head or sit up in bed unaided; that he did not recognize defendant when he returned until complainant roused him and told who it was; and that at no time during his sickness was he mentally in a condition to transact business or understandingly execute a conveyance of his real estate. The husband testifies:

"I know that Michael Murray was never able to make a deed or any other document of any description from the time he laid down until he was buried. I know he was not."

Complainant and her husband were not consulted nor advised of the making of these conveyances, although she was in the house at the time. Neither was defendant present. She testifies that Charles Murray came to the house about 10 o'clock in the forenoon of August 17th, asked as to the condition of her father, said he had been sent for by him to make out some reports, and was told by her to go in and see him; that Patrick Murray was also there, and the two went in together; that the doors were open, and she was around the house, but paid no attention to what was going on; that, having occasion to go into the sick room, she saw Patrick signing a paper which looked like a deed; that nothing was said to her about the matter, except Charles Murray stated, as he was going away, that he could not make out the reports, as he knew nothing about them.

Defendant testified that on previous occasions his father had told him he intended to deed this property to him, and had asked him to come down from his work on a week day to be present and help him attend to it; that on the morning of the 15th of August, before defendant left for his work, his father spoke of it and wanted him to come down Friday or Saturday of that week to attend to it; that on his return when summoned his father knew and greeted him, was rational, and his mind clear; that defendant was with him much of the time and sat up with him nights; that until towards the last he was able to rise up in bed, noticed and took interest in what was being done; talked with defendant at times of the family, of defendant's mother and her death, and of business matters; again called up the matter of deeding the property to defendant, and directed him to have Charles Murray, who was a notary, make out the deeds and bring them to him for execution, and that defendant did as his father directed; that after the deeds were prepared he gave them to his uncle Patrick, requesting that he go with the notary and act as a witness.

Patrick Murray, brother of Michael, testified that he was between 83 and 84 years of age, that he and his brother always lived close to each other and worked together; that after defendant handed him the deeds he took them to his brother, who read one after the other and then said, "These are all right;" that he asked witness to get his glasses from the dining room, rose up in bed to read and sign the deeds, and after he acknowledged their execution in response to the inquiry of the notary they signed as witnesses; that his brother was all right mentally, as far as witness could see, competent to understand and execute the deeds, and that he did some business relative to the poor board on a later date.

Charles Murray, the notary, testified that he prepared the deeds at defendant's request, who said his father desired him to do so and to go down and take the acknowledgment; also to attend to some matter pertaining to the poor commissioners; that he went as requested; that complainant came to the door, and Patrick Murray was in the room; that he told deceased he had been requested to come and take an acknowledgment, whereupon deceased pointed to the papers saying, "Yes, the deeds are there;" that witness picked them up, stated to him that they conveyed his lands to his son Thomas, and asked if he wished to sign them, to which he responded decidedly, "I do;" and told witness where to get a pen and ink, raised himself up in bed, took a book witness passed him to write on, and signed the deeds, after which they were witnessed and acknowledged. That to all appearance his mental condition was good and he was competent to do what he did; that when he handed them back to witness after signing, he said, "These deeds are all right."

The doctor and parish priest who attended deceased testified that he appeared all right mentally, and they discovered nothing to attract special attention in that particular. John Murray, a nephew living near by, went in and out more than once daily to see his uncle during his sickness, and when there conversed with him on various topics, which he discussed intelligently. He testified, "I would consider he was compentent to do any kind of business up to three days before he died." Two days before he died a next door neighbor by the name of Quinn, who had known him for many years, called and inquired about him. He testified that deceased, hearing his voice in the adjoining room, called out to complainant and asked who was there. On being informed, he requested that Quinn come in as he wanted to see him; that he then

raised himself up in bed, refusing witness' assistance, saying, "No, I can help myself yet, thank God;" that they visited for about 10 minutes, and deceased talked rationally, manifesting no mental weakness. Another nephew named P. W. Murray, who visited him the day before and the day after the deeds were executed and talked with him on various subjects, saw him sitting up in bed, and testified that he was perfectly competent to execute deeds or transact any business. A niece, who lived within 100 feet and was in to see him several times a day during his sickness, testified that she saw no difference in his mental condition from what it had been for some time before his illness.

Counsel for complainant cite *Noban* v. *Shoup,* 171 Mich. 191 (137 N. W. 75), as an analogous case, and refer to the following language as particularly appropriate:

"The record discloses no reason why the father should have deeded to the defendant all the estate he had in the world (with the exception of a very small amount of personal property), to the practical exclusion of his only other child, the complainant."

There are matters disclosed in this record which might have been thought sufficient reason by deceased. Defendant was and always had been a member of his father's household and had no other family ties. He was crippled, and the father had expressed doubts if others than a relative would give him employment; he had helped his father at times, and for six years bore the burden of the care of an afflicted sister. Complainant had a home of her own, with a husband and six sons, who could and did provide for her.

That the execution of these deeds was but the carrying out of a previous purpose is indicated. De-

fendant so testified; and P. J. Murray, a nephew, shown to be a prominent and responsible business man, testified that he not only visited and talked with his uncle during his sickness and found his mental condition clear and good, but that on former occasions his uncle had expressed his purpose to give this property to defendant; that on August 8, 1910, he had stated to witness that he wanted defendant to come down on a secular day of the week, saying:

"He has been coming down here. Saturday night and back Monday morning and I can't do anything; I wanted to deed this property to him for these last two years, and he would keep putting it off from time to time."

If this testimony is true, and there is nothing in the record to impeach it, the execution of the deeds was but the carrying out of a previously expressed and long delayed purpose which he had entertained for at least two years.

If deceased acted understandingly he had a right to dispose of his property as he saw fit, even though it might be inequitable. In *Beadle* v. *Anderson,* 158 Mich. 483 (123 N. W. 8), this court said:

"The fact that a division is not equal between children regarded apparently with equal affection is no sufficient reason to disturb a disposition of property so made, as has been many times declared."

The parties and their witnesses in this case appear from the record to be all respectable and intelligent persons, mostly related, and it is to their credit that the testimony shows much less acrimony, bitterness, and unkindly recrimination than is usually manifested in this class of cases. There is a conflict in their testimony which cannot be reconciled. No disinterested witness testifies to Michael Murray's incompetency. With the exception of defendant, those testifying to his soundness of mind are disinterested,

so far as shown, had ample opportunity to observe and reason to know, give convincing detail of time and circumstance, and, beyond the bare statement of adverse facts and opinion, manifest no bias or unkindly feeling towards complainant.

Assuming that all the witnesses are equally credible, and applying the rule of preponderance of evidence, we are constrained to conclude that the greater weight of evidence is adverse to complainant's contention, and the decree of the lower court is reversed, and bill dismissed, with costs.

MOORE, McALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ concurred.