POWELL *v*. PENNOCK.

1. Gifts—Joint Bank Accounts—Statutes—Validity.
Under Act No. 248, Pub. Acts 1909 (2 Comp. Laws 1915, § 8038 *et seq.*), a husband who changes his bank accounts, making the same payable to himself or wife, or either, and to the survivor, creates a title in his wife at his death, provided he is competent to act and is not subjected to undue influence.

2. Same.
Act No. 248, Pub. Acts 1909, relating to the creation of bank accounts in the names of the depositor and another jointly and the right of survivorship, is valid.

3. Fraud—Undue Influence.
Fraud and undue influence cannot be inferred from mere opportunity.

4. Same—Undue Influence—Evidence.
Evidence *held*, insufficient to show undue influence and fraud on the part of a wife in inducing her husband to make bank deposits payable to either or to the survivor.

5. Same—Mental Competency—Evidence.
Evidence *held*, sufficient to show mental competency of a husband who transferred large bank accounts to an account made payable to either him or his wife or to the survivor.

Appeal from Barry; Smith, J. Submitted June 13, 1917. (Docket No. 41.) Decided December 27, 1917.

Bill by Ella L. Powell and others against Clara Pennock for an accounting for claimed assets of the estate of Asa B. Pennock, deceased. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

*Alonzo D. Cadwallader,* for plaintiffs.
*Alfred J. Mills,* for defendant.

STEERE, J. Plaintiffs appeal from a decree of the

circuit court of Barry county in chancery dismissing their bill of complaint against defendant, their stepmother, filed to compel her to account for claimed assets of the estate of their father, Asa B. Pennock, deceased, charged to have been fraudulently obtained, sequestered, and appropriated by her.

The case was before this court in a preliminary stage on appeal by plaintiffs from an order sustaining defendant's demurrer to the bill. It was then held that under the allegations in the bill the probate court did not have exclusive jurisdiction over the issue tendered and a suit in equity might be instituted by the heirs to recover from the widow of deceased, whose estate had been closed in the probate court, any property rightfully belonging to the estate which had been obtained by the wife through fraud and undue influence. 181 Mich. 588 (148 N. W. 430). The order of the trial court was therefore overruled and the case remanded with leave to answer. Pleadings were thereafter perfected and the case brought to hearing upon pleadings and proofs taken in open court, resulting in a decree rendered in favor of defendant.

An opinion was filed by the learned circuit judge who heard the case which, with the former opinion of this court, adequately presents for a fair understanding of this controversy the circumstances under which the litigation arose, the relations of the parties and the questions involved, as well as the findings of the court and conclusions of law thereon which plaintiffs review and gainsay as not warranted by the record, and erroneous. It is as follows:

"Bill filed for an accounting and to recover, from the defendant, certain moneys and United States bonds on the ground that they came into the hands and custody of said defendant wrongfully and fraudulently. The complainants in this case are the son and daughter of Asa B. Pennock, deceased. The defendant is the widow of the deceased. The marriage of Asa B.

Pennock occurred April 9, 1910. The death of Asa B. Pennock occurred July 23, 1911.

"Asa B. Pennock had but little education. He was a man of excellent habits and of good reputation among his neighbors and friends as to honesty and fair dealing. Whatever he had in material wealth at the time of his death, he had earned by hard labor, industrious habits, and honest methods assisted by his former wife, who was the mother of complainants. He had a rugged aggressive nature. He hated shams, dishonesty, and fraudulent methods, and had but little patience with the weakness and incompetency of his fellows. He was, however, generous with the unfortunate and sympathetic with their needs, if he believed they were doing the best they could. He had a positive nature and in some ways might be termed opinionated. He was in many ways 'a diamond in the rough.' He was disappointed, and possibly in a sense angered, at the conduct of his two children, the complainants in this case.

"The daughter first married with Mr. Cadwallader. He (deceased) bitterly opposed the same and his feeling was not greatly lessened against her after she obtained her divorce. His efforts to help her and her husband in getting along in the world were so fruitless that his disappointment increased his bitterness, which abated in some degree after her marriage with her present husband, Charles E. Powell. The son, Addison J., as a youth and during his manhood, was a source of constant anxiety and care on account of his intemperate habits. Asa B. Pennock had but little sympathy for the weakness that develops dissipation and the train of evils that follow. For ten years, from 1888 to 1898, he was the legal guardian of this son, on petition of his son's wife. While since the guardianship has been terminated the son's habits had been improved, yet he has not been and is not now a total abstainer in the use of intoxicating liquors.

"Notwithstanding the disappointment of this father, the record shows that he has given to this son and this daughter material help aggregating hundreds of dollars in direct giving and the payment of claims against them, and in many other ways swallowed his disappointment and given them help far beyond what

many fathers would have done. He has given to the two sons of Addison Pennock his large home farm of over 300 acres, situated in Barry township and near the village of Delton, and worth, as shown by the proofs, upward of $15,000. He has also not only given to the complainants in this case, but has paid them for any and all services they have rendered in the care of his first wife and of himself.

"The defendant in this case had, before her marriage with Asa B. Pennock, been twice widowed and had some property at the time of her marriage to him. She was a hard-working woman and had earned her living by practical nursing and care of the sick. She was a woman of good character and reputation, sympathetic in her nature and possessed of good common sense, and at the time of her marriage was about 50 years old. She had been employed by Asa Pennock to care for his sick wife at the home of Charles and Ella Powell and was caring for her at the time of her death. Soon after her death she was employed by said Asa Pennock to be his housekeeper and acted in that capacity for pay for about 16 months before she and Asa were married.

"A few days after the marriage, Asa Pennock and his wife came to Hastings and he took up certificates of deposit in the Hastings National Bank and opened in the savings department of said bank an account aggregating a little more than $10,500, and had the money placed in the savings department of that bank and a savings bank-book issued to himself and his wife, Clara Pennock, jointly, and arranged, in writing, that the money was payable to either upon a receipt signed by either, and the survivor to be entitled to the entire fund.

"On the 21st day of December, 1910, Asa Pennock and the defendant went to Kalamazoo and to the Kalamazoo National Bank and took up certificates of deposit aggregating $9,000, and had the money placed in the savings department of that bank and a savings-bank book issued to himself and Clara Pennock, his wife, jointly, and payable to either, or the survivor. On the same day, said Asa Pennock and the defendant went to the Kalamazoo City Savings Bank at Kalamazoo, Mich., and took up certificates of deposit aggrega-

ting $12,000, and had the money placed in the savings department of that bank, and a savings bank book issued to himself and Clara Pennock, his wife, jointly, payable to either, or the survivor. These various bank books, with the accumulated interest were afterwards, and after the death of Asa Pennock, surrendered to the banks, and new books issued or the money paid to Clara Pennock, the defendant in this case. She received from the same upwards of $32,000. As to the government bonds, the proof fails to show that any came to the hands of the defendant. It is to place these various amounts of money in the estate of Asa B. Pennock for distribution to the heirs, or to recover the share of complainants therein under the statute of distribution that this bill is filed.

"Before disposing of this case, it may be well to state that, under the law, courts have no right to enter decrees, or judgments, by which any person will be deprived of the right to dispose of his or her property as seems best and just to them. Every person has the right and should be permitted to dispose of property as he or she sees fit to do, subject to the rights of creditors and the claims of dependents and the rights of a widow, which are guaranteed by law. So far as the complainants in this case are concerned Asa B. Pennock was under no legal obligation to give them a dollar of his property. He had a right to do with it as he wished and if he was competent to do what he has done and did it of his own volition, it ought to stand, no matter what others may think he should have done for his children or grandchildren.

"It is my judgment that there are three questions to be considered in disposing of this case: (1) Did the act of changing his bank accounts, making the same payable to himself, or wife, or either, and to the survivor, create a title in the same in Clara Pennock at his death, under the law, provided he was competent and did the same freely and of his own volition? If it did not, that would end the case and the complainants would be entitled to the relief sought. If it did, then (2) Was Asa Pennock competent to do what he did do when it was done? and (3) Was it of his own free will that he did it, if he was competent, and Was his action procured by fraud or undue

198—Mich.—37.

influence on the part of the defendant, or some one in her behalf?

"I am of the opinion that the first question is answered by Act No. 248 of the Public Acts of 1909, and the case of *State Bank of Croswell* v. *Johnson*, reported in 151 Mich. at page 538 (115 N. W. 464), and that a title was created in the defendant in the savings bank account books and that she was entitled to the money they called for by right of survivorship, provided Asa Pennock was competent to act and was not unduly influenced to do what he did do.

"(2) Was Asa Pennock competent to dispose of his property under the law? I do not think it necessary to review the testimony taken at the hearing at length. From the proof taken, I have not the least doubt of his competency. I think, taking into consideration the character of the witnesses, their means of information, their interest or lack of interest in the result of the suit, that the proof of his competency largely preponderates in favor of a finding that he was competent and fully knew and understood what he was doing and the effect of it upon those who would share in his estate had he died without disposing of the property as he did.

"(3) Was any fraud practiced on him, or was he unduly influenced by the defendant, or any one in her behalf, to do what he did do? It is my judgment that there is not a scintilla of proof that this was done. The most that can be said is that she had the opportunity. There is not the least proof that she took advantage of it. The proof is undoubted that she married Asa Pennock in good faith promising to be his wife and minister to his needs and care for him as she should do as his wife, and that she did this without stint or limit and devoted herself constantly to his comfort, is not disputed by any one. She was true to him, and if her offices as a good, true wife in ministering to his care and comfort has brought her close to him, and of his own free will he has supplied her with a competence, it should not in my judgment be disturbed, and under the law cannot be."

That the trial judge correctly decided the question

of law proposed in his first interrogatory proposition, there can be no doubt. Not only are his conclusions in harmony with *State Bank of Croswell* v. *Johnson, supra,* but the constitutionality of Act No. 248, Pub. Acts 1909 (2 Comp. Laws 1915, § 8038 *et seq.*), questioned in the briefs of plaintiffs' counsel, is decided in *Re Rehfeld's Estate, ante,* 249 (164 N. W. 372), which is cited with approval in the recent case of *People's State Bank* v. *Miller's Estate, post,* 783 (165 N. W. 608).

Plaintiffs' claims of fraud, undue influence, and mental incompetency are primarily questions of fact with the burden of proof resting upon them. As presented by this record fraud and undue influence are contingent upon the issue of the deceased's mental competency. In the absence of the latter even the claimed inferential evidence of the former disappears. Opportunity alone affords no inference. The record is barren of any direct evidence of acts or words on defendant's part tending in themselves to show fraud or undue influence. The evidence is most conclusive and practically conceded that when in his right mind and full possession of his mental faculties deceased was of a positive, impelling nature, given to forming his own conclusions, acting upon his independent judgment and not to be influenced, unduly or otherwise, to adopt any course of action he had not independently decided upon. The gist of plaintiffs' claim is that deceased's natural powers had abated and his mentality failed to incompetency, taking advantage of which defendant unduly influenced him to dispose of a portion of his estate as he was not of his own free will inclined to do and on his own initiative would not have done, thereby defrauding them of their rights as his heirs.

The legal principles applicable to the issue of mental incompetency as here raised are well settled in this State and elsewhere. Amongst the many cases

cited the following are more or less in point upon
various phases of the testimony: *Kempsey* v. *Mc-
Ginniss,* 21 Mich. 123; *Fraser* v. *Jennison,* 42 Mich.
206 (3 N. W. 882); *Rice* v. *Rice,* 50 Mich. 448 (15
N. W. 545); *In re Shepard's Estate,* 161 Mich. 441
(126 N. W. 640); *Haines* v. *Hayden,* 95 Mich. 332
(54 N. W. 911, 35 Am. St. Rep. 566); *Hibbard* v.
*Baker,* 141 Mich. 124 (104 N. W. 399); *Schneider* v.
*Vosburgh,* 143 Mich. 476 (106 N. W. 1129); *In re
Hoffmann's Estate,* 151 Mich. 595 (115 N. W. 690);
*In re Ganun's Estate,* 174 Mich. 286 (140 N. W. 561);
*Reagan* v. *Murray,* 176 Mich. 231 (142 N. W. 545);
*In re Williams' Estate,* 185 Mich. 97 (151 N. W. 731);
*In re McIntyre's Estate,* 193 Mich. 257 (159 N. W.
517); *Ginter* v. *Ginter,* 22 L. R. A. [N. S.] 1024, and
cases cited (79 Kan. 721, 101 Pac. 634).

Any attempt to outline and review at length all
testimony of many witnesses called by the respective
parties and the elaborate arguments of counsel con-
tained in the over 1,600 printed pages of record and
briefs with which this case is enlarged would involve
no unsettled legal questions, serve no useful purpose,
and be of no interest to any one except the litigants
and their counsel. Large portions of both record and
briefs are devoted to biographies (auto and otherwise)
of the parties to this litigation, their relatives, friends,
and enemies, including some of their attorneys, often
tainted in the extreme with aspersive matter which,
whether true or false, is of scant relevancy and best
ignored.

A search of this long record with the questions of
deceased's mental competency and capacity to inde-
pendently plan and act for a desired purpose upper-
most sustains the thought that, sanely considered from
his viewpoint, what he did is not shown to have been
unwise or unnatural at his time of life as he was then
situated. During his long life since early manhood

he had always lived in domestic relations and maintained a home of his own, most of the time in the country upon his farm. In 1911 he decided to establish a home for the declining years of himself and his then wife in the nearby village of Delton and to that end selected a place in the suburbs with ample grounds where he could, and did, continue to a degree the familiar environments and characteristics of a country home which a long life had made attractive to him, keeping a horse, cow, pig, poultry, etc. So far as shown, and aside from the conduct of his children in certain respects, his home life with his first wife had always been pleasant and congenial. It is undisputed that such home conditions were re-established after his second marriage and continued until he died. His children were as welcome there as before, were on friendly terms with defendant, conceded that she was kind and congenial, a good housekeeper, and took good care of their father and his home until he died.

Deceased's first wife, who was about three years older than he, became mentally unbalanced and practically helpless about two years before her death, and was thereafter a constant care. He tried to keep up his home and care for her there with hired help, employing several different women as housekeepers, but they were unsatisfactory or would not remain, and for a time his wife was cared for at the homes of their children, for which he paid, living himself at his own home. To relieve his daughter of the burden of caring for her mother he secured the services of defendant to care for his wife at the home of his daughter and son-in-law. She proved an efficient and satisfactory nurse and caretaker, remaining in that service and caring for his wife until her death. Of this his son-in-law, Charles Powell, says in part:

"I told him he had got a good woman taking care of him and to take his wife home, because my wife

wasn't capable of taking care of her; wasn't able to do it any longer, and I said, 'I wouldn't have my wife as your wife is for all the money you ever had.' 'Well,' he says, 'I couldn't keep a woman in my place five minutes if she was there.'"

Powell and his wife were then living on a farm of 110 acres which deceased had given them.

After the death of his first wife deceased preferred to, and did during most of the time, continue to live at his own home. His children had homes of their own and were interested in their own affairs. He tried unsuccessfully to get his granddaughter and her husband to live and keep house with him, and in 1908, when unwell, lived at his son's home for a time, paying for his board, but this proved unsatisfactory to him and he returned to his own place, living alone for a time, and eventually employed defendant as his housekeeper, subsequently marrying her as stated. He had stood by and helped his two children, who had been a disappointment and source of anxiety to him for many years, until they were well past middle life, settled in homes of their own on valuable farms which he had given them. He had previously given his daughter, after her first marriage against his wishes, a valuable farm adjoining the city of Hastings, which was squandered, and upon her second marriage, without his knowledge or consent, to her present husband who was then a farm hand, he ultimately gave them the farm they were living on when he died. He had first started his son in business in Hastings, where his dissipation was such that he proved a failure, and then established him on a farm, where he so conducted himself that his own wife petitioned the probate court for a guardianship to control him, which deceased assumed and exercised for 10 years, in the meantime paying off a mortgage on the son's farm, and before he remarried he deeded his former home farm of 360

acres to his son's children. During his long and active life he had been thrifty, efficient, and successful in his pursuits; primarily a thorough and capable farmer he was also a stock dealer and at times engaged as an auctioneer. He had made money and was well off. Without going into details the record gives support to the contention that he had given to plaintiffs and their children from his accumulations nearly twice in value that which he saved for himself in his old age. After what he had done for them, and his experiences with them, it was not unnatural nor passing strange that he decided to remarry and re-establish himself in his old home where he desired to be and, as he told friends he proposed to do, provide that the wife whom he selected and who made a pleasant home for him in his old age, as he said defendant did, would be "well taken care of" and "never regret it." He took counsel with others as to how to most conveniently provide this and be safe himself, after which he adopted the course stated. If he understandingly entertained such views and intent, it appears to be conceded he did not make an unwise selection, for the testimony is practically undisputed that defendant was a kind and congenial wife to him, took good care of his home and him, when he needed care. After their marriage he told his cousin Ebenezer Pennock, an old resident and leading citizen of the county, that "he was going to Hastings to fix matters so she would never have to work out." Of his mentality this witness said:

"I never saw Asa B. Pennock when I thought he was not competent to understand his business and transact it. He was always competent to transact his business and understood it and had a good mind and memory. The last time I see him he was just as capable to talk about stock or horses or anything else as he ever was, from anything I could see."

It is strenuously urged in the briefs of plaintiffs' counsel that this was purely a mercenary marriage

on defendant's part for which she planned and schemed to get the old man's money, while defendant's counsel deny this and argue more meritorious motives. While that issue is of scant materiality, it may be conceded and seems probable that neither party was actuated by any romantic or altruistic notions on the subject of matrimony, and both took a practical view of the temporal and material benefits anticipated from this alliance. Both had been married before and were of mature years. He was an old man and she, though much younger, was an elderly woman, past the childbearing age. What motives may have actuated them to enter into this marriage contract is immaterial, provided they mutually so desired, understood what they were doing, and were qualified to contract.

As to deceased's mental vigor and competency at the time under consideration there is of course conflicting testimony, but a study of this record leads strongly to the impression that his ability to do business, manage his affairs, and make contracts was never seriously questioned until after his death, and this litigation arose. He retained possession of, and actively managed the affairs of, the large farm he had deeded to his grandsons, came and went as he pleased, bought and sold, collected and paid, transacted business at the banks and elsewhere until near the time of his death. Old neighbors, bank officials, and experienced business men who have no apparent bias or interest in this litigation testify strongly in substantiation of his retained mentality. Whatever physical infirmities of age he may have been afflicted with, we cannot find it affirmatively shown by a preponderance of evidence that they noticeably impaired his mentality, incapacitated him from the exercise of his normal business judgment, or from rational conduct in the ordinary affairs of life.

We find no occasion upon this record to disturb the

conclusions arrived at by the learned circuit judge, who had the witnesses before him and heard their testimony.

The decree dismissing plaintiffs' bill is therefore affirmed, with costs to defendant.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.