## KOURI v. FASSONE.

1. FRAUD—CONSTRUCTIVE FRAUD.
   Constructive fraud in the execution of instruments is inferred from the conditions and relations of the immediate parties to the transaction.

2. DEEDS—FIDUCIARIES—MENTAL COMPETENCY—UNDUE INFLUENCE.
   Invalidity of a conveyance of property to a grantee who stands in a fiduciary relation to the grantor is merely presumed, whereas if there be no such relation existing the party seeking to prove invalidity must show incompetency of, or undue influence upon, the grantor.

3. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW.
   The Supreme Court considers an administrator's suit to set aside assignments and conveyances of real estate and for an accounting by a *de novo* review on the record presented.

REFERENCES FOR POINTS IN HEADNOTES
[1] 23 Am Jur, Fraud and Deceit §§ 4, 14.
[2] 16 Am Jur, Deeds § 40.
[3] 5 Am Jur 2d, Appeal and Error § 822.
[4] 16 Am Jur, Deeds §§ 375, 402.
[5–7] 16 Am Jur, Deeds §§ 38, 39.

4. DEEDS—FIDUCIARIES—PRESUMPTIONS—BURDEN OF PROOF—EVIDENCE.

Defendant daughter with whom mother lived during her serious, prolonged, and final illness and who occupied a fiduciary relationship with the deceased *held*, to have sustained her burden of proof to overcome presumption of invalidity of the assignments and conveyances of property made to defendant while the mother was being cared for by defendant.

5. SAME—MENTAL COMPETENCY—WEAK MINDEDNESS.

Mere weak mindedness, whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat a conveyance.

6. SAME—UNDUE INFLUENCE.

The ultimate question to be determined on the issue of exertion of undue influence in the execution of a conveyance is whether the disposition by the grantor was voluntary and in the search of undue influence the court looks at the whole spectrum of circumstances, not at 1 facet.

7. SAME—UNDUE INFLUENCE—KINDNESS.

Influence earned by kindness and care for the grantor of property then suffering a prolonged illness, while administering to the grantor's wants or contributing to her comfort, cannot be said to be undue.

Appeal from Wayne; Piggins (Edward S.), J. Submitted April 5, 1962. (Calendar No. 27, Docket No. 49,259.) Decided May 9, 1963.

Bill by Thomas A. Kouri, as administrator of the estate of Catherine Kouri, deceased, and as guardian of Lucille Kouri, a mentally incompetent person, against Dorothy M. Fassone to set aside assignments and conveyances of real estate and for accounting. Bill dismissed. Plaintiff appeals. Affirmed.

*Kelly, Oster & Brennan (Craigen J. Oster,* of counsel), for plaintiff.

*John L. Potter,* for defendant.

SMITH, J.

## Parties to the Action

This is an action by brother against sister to set aside conveyances of the mother allegedly made to the sister. Suit was instituted shortly after the death of the mother. Plaintiff brother brings suit in his capacity as administrator with the will annexed of his mother's estate, and also as guardian of another sister who is mentally incompetent. Catherine M. Kouri, the deceased mother, made a will in 1952, leaving the property to her mentally incompetent daughter, Lucille. In 1959, however, apparently she conveyed her interest in the same property (2 parcels) to defendant daughter in whose home decedent resided during her terminal illness. After trial, the circuit court judge entered a decree dismissing plaintiff's bill of complaint. From this decree, appeal is taken.

## Plaintiff's Proofs

During the period of her terminal illness, from August 1958, approximately to the date of her death, March 18, 1960, decedent lived with defendant daughter. The conveyances in question were executed on May 6, 1959, at the home of defendant. The conveyances consisted of an assignment of deceased vendee's interest in a land contract, and also the assignment of deceased's interest as vendor in a land contract, accompanied by a quitclaim deed. Present at the home, were mother and daughter, 2 attorneys, and a notary. One of deceased's sons happened by but did not remain long and took no part in the transaction. Notice of assignments was not immediately given by defendant, but interested parties were advised by November, 1959. Defendant, Dorothy Fassone, never openly asserted ownership of the property during her mother's lifetime. Allegedly, she told plaintiff, in a conversation after the convey-

ances, that she did not have control of the property. It was apparently known by members of the immediate family that decedent had made her will in 1952, leaving the property in question to the mentally incompetent daughter. Defendant is said to have assured members of the family that the mentally retarded daughter would receive both properties under the will. At the funeral home, another sister overheard a conversation between defendant and a real-estate agent. This prompted an investigation by plaintiff brother who discovered that defendant had listed the property in February, 1960, approximately a month before the mother's death. Plaintiff claims that when he was shown the listing agreement at the real-estate office he saw a notation on it as follows: "If anyone asks who owns this property, tell them Catherine Kouri." The real-estate broker was brought to the hearing under subpoena *duces tecum* but claims that he could not find the listing agreement and could not remember whether such a notation appeared on it. Defendant, however, did introduce her copy of the listing agreement, but it bore no such notation.

While it is clear that defendant never tried to prevent other members of the family from visiting decedent in her home, it is evident that she was anxious, at least, for some of the visitors, not to have a private visit with Mrs. Kouri, especially about the mentally retarded daughter. The parish priest was effectively prevented from discussing living conditions of Lucille, the mentally retarded daughter. He made 3 trips to defendant's home without success. He testified that his reason for making the visits was because Lucille had complained to him about her living conditions in the home. Defendant's reported expression on this incident is that she thought any discussion of Lucille might upset her mother.

Plaintiff also presented testimony as to the general physical and mental condition of deceased during her terminal illness. Prior to the illness, she had suffered at least 3 heart attacks, and although there was a peculiar absence of medical testimony about her condition, it was said that she suffered a "paralyzing stroke" as her last illness. It is not denied that she wept on occasion and that she was unable to take care of her personal needs due to paralysis. Plaintiff's proof showed, at least, that she had occasional lapses of memory, although it must be said that the testimony of witnesses on both sides tends to show that deceased conversed freely with all visitors.

## Defendant's Proofs

On the date of the conveyances in question, May 6, 1959, Mr. Potter, now counsel for defendant, was accompanied by Mr. Connolly, his office associate, to defendant's home. A secretary was taken along also to act as notary. Mr. Connolly has no interest in this case. His purpose in accompanying Mr. Potter was to ascertain if decedent were competent to engage in the transaction. He testified that he questioned decedent at some length and found "that she knew what her property was and who was going to get it and the reasons for giving it to her daughter." His opinion was that based upon the answers given he felt that she had "sufficient mental capacity." In the conversation, deceased mentioned her mentally retarded daughter. The record does not disclose that there was any discussion about the will previously made and what effect the conveyances would have upon the property disposition made in the will. Mr. Connolly did, however, ask deceased if she understood that by signing the documents she no longer would have control of the property. He indicated

that her answer exhibited a clear understanding of this point.

Other witnesses testified that deceased stated in April, 1959, that she was going "to sell" at least 1 of the properties to defendant because defendant had always taken care of her. Another witness testified that just 2 days after the conveyances she was informed by the deceased that she had "turned over" the house to defendant. Both witnesses thought deceased was of sound mind. Of like import is the testimony of several other witnesses. One of these characterized deceased as "sane, sound and stable." Another said "Her mind was perfect, she knew what she was doing."

It was shown that defendant handled all of her mother's finances, including collecting moneys from the property and paying bills. The net income of deceased was estimated at $84 per month. Defendant's husband testified that the money was used to pay hospital bills, medicines, doctors, and to maintain 1 of the properties, that is, the 1 being purchased on land contract. There was testimony that deceased had medical and hospitalization insurance. Premiums were paid by decedent's children. There is testimony also that occasionally the children of deceased provided some small assistance to the mother over the course of her various illnesses. It is clear, however, that defendant provided the chief care after each serious illness, including the terminal illness.

## Trial Court's Ruling

The trial judge in an opinion from the bench summed up the case in this manner:

"The court sees in this case 4 principal issues: First, where is the burden of proof? Second, were these instruments executed by the deceased? Third, if they were executed by the deceased, were they so

executed under undue influence or duress sufficient to legally nullify them, and/or fourth, if they were executed by the deceased, was she so mentally incompetent at the time of the execution as to invalidate the conveyances in question?"

The trial judge found that there was a fiduciary relationship between deceased and the defendant and that "the burden of proving the fairness of the transaction and the absence of fraud or undue influence rests upon the person seeking to uphold the conveyances in this case—in this case the defendant." After weighing the testimony of a handwriting expert against 1 of the actual witnesses to the conveyances, together with confirming testimony, the trial judge found that deceased did execute the conveyances in question. Next in his opinion he discussed the question of undue influence. As to this, he said:

"Scrutinizing this record as carefully as possible, even analyzing it in favor of the plaintiff as much as possible, giving the greatest weight to the plaintiff's side, taking in consideration all the testimony, this court cannot honestly conclude that there is any showing of any undue influence; and to the contrary, this court must conclude that the defendant has sustained the burden of showing an absence of undue influence, which is what the law requires him [*sic*] to do, under these circumstances."

As to mental incompetency, the trial judge said:

"It must appear affirmatively that the grantor was laboring under such a degree of mental infirmity as to make her incapable of understanding the nature of her act, and if she is capable of understanding in a reasonable and rational manner the nature and character of the transaction which she here in this case engaged in, then she is competent to do the act or to perform the act which she performed."

He then reviewed the testimony of some of the witnesses tending to show rationality on the part of the

deceased, and concluded that the deceased was mentally competent.

## Argument on Appeal

Plaintiff advances a variety of reasons for reversal here on appeal. He claims that in view of the presumptive invalidity of the transaction by reason of the confidential relationship, the court should have scrutinized more carefully the transaction in light of all the circumstances surrounding it; he claims that these circumstances strengthen the presumption of fraud and undue influence. Specifically, he refers to the secrecy of the transaction, the mental and physical weakness of the deceased, the lack of competent and independent advice, and what he calls the incongruity of the transaction by which the deceased allegedly completely reversed the lifetime concern for the welfare of the mentally retarded daughter. Plaintiff claims also that defendant's failure to testify creates an additional inference. He further claims that the failure of the defendant to call the notary to the transaction creates an additional inference that her testimony would have been unfavorable. Among other things, he argues also that the consideration for the transfer of the conveyances was grossly inadequate. *Defendant retorts* that plaintiff failed to prove undue influence or mental incompetency; further, that it was affirmatively proved by defendant that the conveyances were legally executed.

## Decision

The principles lie within that branch of equity jurisprudence in which constructive fraud is inferred from the conditions and relations of the immediate parties to the transactions. This encompasses 2 distinct classes of cases, neither of which, however, is exclusive of the other. We quote 3

Pomeroy, Equity Jurisprudence (5th ed), § 943, p 748, in this regard:

"The whole subject is therefore separated into 2 branches: 1. Transactions void or voidable with persons totally or partially incapacitated; 2. Transactions presumptively invalid between persons in fiduciary relations."

In note 6 at the bottom of the page already cited, the author makes this comment as to the 2 classes of cases. There are "2 distinct classes of cases, which are governed by quite different rules, namely, those in which, from the relations of the parties, invalidity is merely presumed, and the burden of proof is cast upon the one benefited to overcome such presumption by showing good faith; and those in which the voidable character is inferred as a conclusion of fact, without any presumption from the partial incapacity of one party, or the overmastering influence exerted by the other. In the latter class, if the evidence of the incapacity or unlawful influence is satisfactory, the voidable character of the transaction results as a necessary conclusion; there is no mere presumption to overcome."

We are mindful that we review this case *de novo.* It is not contested on appeal that defendant was in a fiduciary relationship with deceased. The burden of proof was therefore on defendant to overcome the presumption of invalidity. This assumes, of course, that deceased did execute the conveyances to defendant. We think the testimony was more than adequate to sustain the trial judge in this finding. Now, as to whether defendant met the presumption of invalidity, we think it most significant that on each occasion when deceased had a serious health problem she turned to her daughter, the defendant. Her terminal illness lasted from August, 1958, to March, 1960, during which time defendant had the under-

standably difficult task of nursing an invalid mother. Others may have claimed their willingness, but on each occasion of serious illness it was defendant who actually performed. Help received from other members of the family was incidental. It is reasonable to infer that deceased may have wished to reward this kind of diligence and loyalty.

It is significant to note also, that the time and manner of execution suggest deceased gave the matter mature consideration. It was in May, 1959, approximately 7 months after the onset of the last illness that the conveyances were executed. The testimony seems clear that this was during the period of her highest recuperation. There is testimony also that approximately 1 month before the conveyances the deceased discussed the matter with a friend. Deceased told her friend that defendant had taken care of her for quite a number of years, that therefore, she thought she would "sell" the house to defendant. This friend advised her merely to see an attorney. Shortly after the transaction had been completed, she told another friend that she had turned the property over to defendant. It is also significant that between the time of the conveyances and the time of her death there is no expression of a contrary wish, according to the record.

We think defendant successfully met the presumption of invalidity by the presentation of these objective facts. Objective facts have a militancy all their own. Defendant has sustained the burden of proof in overcoming the presumption. So far, we have been careful not to discuss the claims of mental incapacity and undue influence. This is a test which defendant is yet to meet.

If there is satisfactory evidence of mental incapacity or unlawful influence, the transaction is voidable as a conclusion of fact. We have already related the testimony coming both from defendant's

witnesses and also some of plaintiff's witnesses that deceased was able to engage in normal conversation, that she appeared to be "rational", that she appeared to be "sound and stable" and so on. Admittedly, the proofs are not perfect on this point: she cried at times, and occasionally her mind would wander. There were domestic scenes, not entirely unnatural, which might have been explained better. However, the dominant impression gathered from the testimony of all witnesses who had contact with the deceased during the period of her terminal illness was that she was laboring under no such incapacity as to make the transactions voidable. Mere weak mindedness whether natural or produced by old age, sickness, or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own free will, is not a sufficient ground to defeat a conveyance. *Reagan* v. *Murray,* 176 Mich 231; *Wroblewski* v. *Wroblewski,* 329 Mich 61, 66.

As to undue influence, it is not possible to formulate a single definition embracing all forms of undue influence. The law is settled that we view each case largely upon its own circumstances. Particularly in search of undue influence, we look at the whole spectrum of circumstances, not at 1 facet. The ultimate question is whether the disposition was voluntary. We are not unmindful that defendant was in a strong and perhaps dominant position with her mother, but there is no evidence to indicate that the strong position of the daughter in any way influenced the disposition of the property. The testimony as to defendant's conduct, while unsatisfactory in some particulars, is not the kind from which we may properly infer undue influence. Influence earned by kindness and care, while administering to a person's wants or contributing to his comfort, cannot be said

to be undue. *Mackall* v. *Mackall,* 135 US 167 (10 S Ct 705, 34 L ed 84).

The decree dismissing plaintiff's bill of complaint is affirmed. Costs to appellee.

Kelly, Black, Kavanagh, and Souris, JJ., concurred with Smith, J.

Carr, C. J., and Dethmers, J. concurred in result.

O'Hara, J., took no part in the decision of this case.