FENKELL v. BAKHAUS

1. DEEDS—INCOMPETENCY—FIDUCIARY RELATIONSHIP—EVIDENCE.

   A finding that no fiduciary relationship had existed between defendant and plaintiff's incompetent for three years before plaintiff's incompetent made defendant a joint tenant in her property, nor for nearly ten years after that transfer, was not error where there was no evidence produced by plaintiff showing a fiduciary relationship between plaintiff and defendant.

2. DEEDS—INCOMPETENCY—FIDUCIARY—UNDUE INFLUENCE—BURDEN OF PROOF.

   In the absence of a fiduciary relationship, one who asserts the invalidity of a conveyance of property based on the grantee's undue influence upon the grantor must prove that undue influence.

3. DEEDS—INCOMPETENCY—EVIDENCE.

   A finding that plaintiff's incompetent knew what she was doing when she made defendant a joint tenant in her real estate was not against the weight of the evidence where witnesses testified that plaintiff's incompetent was a strong-willed person, that she was very competent and had handled her business affairs for many years, with legal assistance when required, and that she had told these witnesses that she made defendant a joint tenant because she wanted him to have her property upon her death without going through court.

Appeal from Wayne, Neal Fitzgerald, J. Submitted Division 1 December 3, 1969, at Detroit. (Docket No. 4,798.) Decided February 3, 1970.

REFERENCES FOR POINTS IN HEADNOTES

[1] 23 Am Jur 2d, Deeds § 46.
[2, 3] 41 Am Jur 2d, Incompetent Persons §§ 130, 131, 142.

Complaint by William Fenkell, guardian of the estate of Grace B. Singer, a mentally incompetent person against George Bakhaus for an accounting and vacation of real estate deeds. Judgment for defendant. Plaintiff appeals. Affirmed.

*Hill & Moehlman* and *Tilden M. Gallagher,* for plaintiff.

*Travis, Warren, Nayer & Burgoyne* and *William Sempliner,* for defendant.

Before: R. B. BURNS, P. J., and HOLBROOK and V. J. BRENNAN, JJ.

HOLBROOK, J. This is an action brought for an accounting and to vacate deeds to a valuable farm in Washtenaw County, Michigan. We deem it necessary to state some of the facts in the background of this contested action to better understand the controversy. In 1950 the property in question was owned by three parties, Grace B. Singer, Jessie Leonard and Cora Kelley. In July, 1950, Jessie Leonard passed away leaving her one-third interest to her surviving sisters. Her estate was probated by Claude H. Buzzard, an attorney at Plymouth, Michigan. Mrs. Cora Kelley lived with Grace B. Singer in 1952 when George Bakhaus, the defendant herein, became acquainted with Grace B. Singer. They became friends and the defendant was asked to do menial tasks and errands by Mrs. Singer. Mrs. Kelley was ill and bedridden a part of the time. Defendant performed these acts of kindness which were pleasing and helpful to Mrs. Singer.

Defendant visited the sisters two or three times a week and invariably performed services according to their needs. On December 31, 1954, Cora Kelley

and Grace Singer went to Claude H. Buzzard's law office and had the title to the farm land in question placed in their names, jointly, and to the survivor, through a strawman-deed holder, Mrs. Buzzard, the wife of the attorney. On March 30, 1955, Cora Kelley passed away at the University Hospital at Ann Arbor.

The defendant continued to do many menial tasks and errands requested of him by Grace Singer. In July, 1955, unbeknownst to defendant, Grace Singer visited Mr. Buzzard's office again and caused the title to the farm to be placed in her name and the defendant's name, as joint tenants, and to the survivor of them, through the use of the same strawman-deed holder, Mrs. Buzzard. At this time, Mrs. Singer was in her seventies and defendant in his thirties. About 30 days thereafter, Mrs. Singer told the defendant what she had done. Commencing in August, 1955, the defendant's name was put on a joint bank account with Mrs. Singer. This bank account was always under the control of Mrs. Singer and the book was given to the defendant on occasion so that he could make deposits and withdrawals in accordance with her instructions. Mrs. Singer, during all this period of time and until about 1965 when she fell and broke her hip, conducted her own business, dealt in real estate and consulted with her attorney on these transactions, collected rent on seven or eight houses and consulted with her certified public accountant from time to time on tax matters. After she broke her hip she was put in a convalescent home and defendant was called upon to perform more errands and more services. During all of this period defendant visited Mrs. Singer four to five or more times a week and performed the menial needed tasks requested of him by Mrs. Singer.

Mrs. Singer was a childless widow and her closest relatives were two cousins living in Williamston and Lansing, Michigan. These two cousins did visit Mrs. Singer occasionally during this period of time, but were not close to her.

On October 28, 1966, Grace B. Singer was declared a mentally incompetent person in the probate court for Wayne county and William Fenkell was appointed guardian. At that time the defendant turned over to Mr. Fenkell at his request the balance in the bank account of $22,822.26.

Thereafter, the guardian brought this action and, as a basis for relief, he alleged in his complaint that defendant was in a position of trust and confidence and acted in a fiduciary capacity for Mrs. Singer before and at the time the property was placed in their names jointly with right of survivorship; that there was no consideration for the placing of the property in their names jointly and that defendant used pressure and misrepresentation and exercised undue influence on Mrs. Singer to cause the deeds covering the property to be signed. The defendant, in his answer, denied these allegations of wrongdoing and denied that he was ever acting in a fiduciary capacity for Mrs. Singer, but only performed menial tasks and errands always at the express request and under the direction of Mrs. Singer. Further, that he did not request nor influence Mrs. Singer to execute the deeds; that, in fact, he knew nothing about them for about a month after they were signed and recorded. After hearing the testimony* on behalf of both plaintiff and defendant, the

---

* The plaintiff's witnesses were: George Herbert Bakhaus, the defendant; William Fenkell, guardian; and James C. Cutler, an appraiser; the defendant's witnesses were Dunbar Davis, an attorney and acquaintance of Mrs. Singer; Don Sherrick, a shareholder of the farm for Mrs. Singer; George Graham, a renter of one of Mrs. Singer's houses; Ruby Daugherty, an employee of Mrs. Singer;

trial judge, Honorable Neal Fitzgerald, denied the plaintiff any relief and dismissed the complaint. Plaintiff appeals and raises several questions which we restate as follows:

1. *Was a fiduciary relationship between Mrs. Grace Singer and defendant established?*

2. *Was defendant required to sustain the burden of proof in proving the fairness and propriety of the deed in question?*

3. *Was the judgment of the trial court against the weight of the evidence?*

These questions are discussed and disposed of later in this opinion. The trial judge in determining the case stated as follows:

"Well, the general rule in a case like this is that one may do with their property as they wish. The claim in this case is that the plaintiff's mentally incompetent ward was not doing what she wished, but was doing what she did because she was under the influence of the defendant.

"I took great pains during this trial myself to query the witnesses with regard to the mental condition of the woman who is now incompetent. All of the testimony without exception indicated that she was mentally in very good condition. She handled her own business. She was sharp. She knew what she was doing. And there was no testimony produced by the plaintiff to indicate that she was in any other condition, at the time this deed was executed and for some years thereafter, than in excellent mental condition. I am sure that if there had been any weakness in her mental makeup during that period there would be testimony in here to indicate it. But there hasn't been any produced. She did her own business. She handled her own transactions. She made use of her own lawyers. And she

Daisy Mae Mills, a housekeeper for Mrs. Singer, and Crystal Sherwood, a friend of Mrs. Singer's for 35 to 40 years.

handled real estate deals on several occasions as indicated by the evidence in this court.

"The defendant comes into the picture; and it isn't explained how the relationship arose very well, I have to concede. But it is pretty plain from the record that he was good to this old woman. She was 76 years old at the time, or right around that age, and he was good to her.

"The plaintiff says that there was a fiduciary relationship between the two of them. I don't believe that because I recollect clearly that the plaintiff's attorney, during most of his cross-examination of the defendant, took the position—which was indicated by the type of questions he asked, and so forth —that this man had done practically nothing for this woman. And that is what he set out to establish. I agree with him, from what he produced in that testimony, that this man had not done an awful lot for this woman. He had done menial things like buying her groceries, and so forth; but this court is not convinced that he handled her business for her at all. I don't think it was established. And I do not think that any confidential relationship or fiduciary relationship between the two of them was established. I think this woman was lonesome. I don't think anybody paid much attention to her. And I think probably she was flattered when somebody did. She did not have anybody who was the natural object of her bounty. She didn't have any children. She didn't have any husband. She didn't have any very close relations. I am not sure what her relationship was with the cousins who are in the background of this picture, but from the testimony in this case I must conclude that they were not very close. In other words, she had the usual choice that goes to women or to old women who are alone to give their money to charity, to give it to distant relations, or give it to someone they like. She chose the latter alternative.

"There is no indication whatsoever in this case of him exercising any undue influence over her at all,— no testimony whatsoever. And there is no testimony

that he urged her to make this deed, or that he ever suggested it to her. In fact, the only evidence in the record is that he didn't know it had happened until 30 days afterwards. And what is particularly significant under the circumstances is that this transaction was made by, and in the presence, and with the advice of an attorney, Mr. Buzzard. It wasn't done by this man. It wasn't done by this woman alone. It wasn't a homemade deal. It was done in a lawyer's office with a lawyer's assistance and through the intermediary of a straw man, which indicates that everybody knew what was going on. And there were a long series of transactions that this woman entered into through the medium of this same attorney handling this property and other properties. She knew exactly what she wanted to do. She knew enough to go to an attorney to have it done; and presumably, having consulted with this attorney over a period of years, she discussed this matter with him. Now, the wife of this attorney was served with a subpoena to appear in this case and didn't appear. It is not the defendant's fault that she didn't appear. At the same time it is of some significance, though not very much, that the plaintiff's mental incompetent was here in the courtroom or in the corridor, and she didn't testify. Why, I don't know, because the cases indicate that their testimony is of some value in a matter like this. But she did not testify, although she was present. The reason I don't know.

"The court generally takes the position that this beneficiary was good to this woman. She liked him for that reason. He put himself out to be nice to her. That, in my opinion, is no small thing in this day and age,—to be nice to an old woman. It is a little difficult for the average party, whether there is a thought of gain or not. This man has been consistently good to this woman from the time she made the deed and before she made the deed, for many years, and he went out of his way to be so. I think that she believed that he was a natural object of her

bounty, inasmuch as God had given her any natural object of bounty, and she acted accordingly.

"I have looked over the *LaForest* v. *Black* case, [(1964), 373 Mich 86] and I am familiar with the *Woods* case [(1964), 374 Mich 278]; and I note that in the *LaForest* v. *Black* case it was only seven months before this woman became an incompetent that she made this transaction. That is pretty close. She was probably in shaky mental condition. This woman was in no shaky mental condition from eight to ten years after this conveyance. She had all of that time to change her mind if she saw fit.

"In the *LaForest* case it was also noticeable that the conveyor testified to the undue influence upon her. She said, this woman worked on me until I began to believe what she said was true; and the court took great notice of that. In the *Woods* case we had a case of a 91-year-old man and a secretary who had been with him for many years and who handled practically all of his business transactions. That case points out that the presumption may be rebutted by advice to the donor by an attorney, which was secured in this case. Then it becomes a question of fact, and as a matter of fact this court finds that there was no undue influence exercised in this case.

"The deposition of Mrs. Sherwood, which was read during the argument, shows that the mental incompetent at that time, being in sound mental condition, indicated to a friend that she had no close relatives to whom she felt she should leave her property, and that she did like the defendant Bakhaus and that she intended to transfer her property to him. She did so.

"To return to the first statement that I made in this opinion, one may do with one's property what they wish. This woman did so. I don't think she did it because of any undue influence. Therefore, I am going to dismiss the complaint of the plaintiff, with costs."

We have carefully reviewed the testimony and find ample evidence in the record to justify the findings of fact of the trial judge.

(1) There was no evidence showing a fiduciary relationship between Mrs. Singer and defendant at least for a period of three years before the deed was signed and for nearly ten years thereafter. At no time during this period was any action taken by Mrs. Singer to set aside the deed. The finding of the trial judge that she was competent before and at the time of the signing of the deed and for nearly ten years thereafter not only is fortified by the evidence but also there is no evidence to the contrary.

The defendant agrees with plaintiff's cited rule of law found in the case of *In re Wood Estate* (1965), 374 Mich 278, 285:

"Once such a relationship [fiduciary] is established and the fiduciary or an interest which he represents benefits therefrom, the law recognizes a presumption that he in whom trust was reposed exercised his influence unduly."

Defendant also agrees with the plaintiff's quoted rule of law stated in the case of *Mettetal* v. *Hall* (1939), 288 Mich 200, 215:

" 'It may be stated as settled law, that whenever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the *consideration given for the property is grossly inadequate,* a court of equity will, upon proper and reasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside.' "

Neither of these cases are applicable herein because there was no fiduciary relationship present between Mrs. Singer and defendant George Bakhaus. Mrs.

Singer was a very competent person, one who was conducting her own business all of the period of time in question and who was not suffering from any weakness of mind. Plaintiff failed to establish that the defendant used any undue influence of any kind upon Mrs. Singer. See, also, *In re Jennings' Estate* (1952), 335 Mich 241 and *Fish* v. *Stilson* (1958), 352 Mich 437.

(2) Because the plaintiff failed to establish a fiduciary relationship between defendant and Mrs. Singer, it was incumbent upon plaintiff who asserted the invalidity of the deed based on the claim of the use of undue influence by defendant to prove that fact. *Kouri* v. *Fassone* (1963), 370 Mich 223. The trial judge found that plaintiff failed to establish this fact. We agree with his determination.

(3) Plaintiff's claim that the decision of the trial court was against the weight of the evidence must also fail.

It is true that in reviewing a chancery matter we hear it *de novo, LaForest* v. *Black, supra;* however it is appropriate that we reiterate what was stated therein at pp 93, 94:

" 'The trial judge heard the witnesses, observed their demeanor, and was in the best position to determine their credibility and to conclude what the facts in the case really were. Although this Court on appeal hears chancery cases *de novo,* on the record in this case this Court cannot say that we would have arrived at a different conclusion in the event we had been in the position of the circuit judge of hearing the witnesses testify and observing their demeanor on the stand.' *Straith* v. *Straith* (1959), 355 Mich 267, 277."

Witnesses testified that Mrs. Singer was a strong-willed person, that she was a very competent person, that on occasion she had told them what she had

done, *i.e.*, as to the placing of the title to the property jointly with defendant, and that, at least on one occasion, she had explained that she had made it that way so that it would be the property of George Bakhaus without going through court.

We conclude that the trial court properly disposed of the matter.

Affirmed. Costs to defendant.

All concurred.